This document was signed electronically on April 17, 2020, which may be different from its entry on the record.

IT IS SO ORDERED.

Dated: April 17, 2020



**ALAN M. KOSCHIK**
**U.S. Bankruptcy Judge**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 15-52629 |
| | ) | |
| STEVEN P. MCDONALD, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Adv. Pro. No. 16-05039 |
| _____ | ) | |
| | ) | Judge Alan M. Koschik |
| DANIEL M. MCDERMOTT, | ) | |
| United States Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEVEN P. MCDONALD, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM DECISION ON THE UNITED STATES
## TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

Daniel M. McDermott, the United States Trustee for the Northern District of Ohio (the

"UST"), has filed a complaint (the "Complaint") seeking denial of Debtor Steven P. McDonald's

(the "Debtor"), discharge. The UST alleges that the Debtor knowingly and fraudulently omitted creditors from his bankruptcy schedules and made false oaths regarding the dissipation of his assets, in violation of 11 U.S.C. § 727(a)(4)(A). (Complaint ¶ 24-26). The UST also alleges that the Debtor failed to explain satisfactorily the dissipation of cash assets in violation of 11 U.S.C. § 727(a)(5). (Complaint ¶ 27-29).

Currently before the Court is the UST's Motion for Summary Judgment, filed on May 19, 2017 (Docket No. 22) (the "Motion"). On June 9, 2017, the Debtor filed a Memorandum in Opposition to Plaintiff's Motion (Docket No. 28) (the "Response").

In his Motion, the UST seeks judgment as a matter of law on the Complaint, arguing that the Debtor's deposition testimony and the other evidence submitted with the Motion establish that there are no genuine disputes as to the facts material to the UST's claims and that those facts demonstrate that the Debtor made false oaths and failed to explain satisfactorily the pre-bankruptcy dissipation of the proceeds (the "Proceeds") from two loan/credit arrangements (defined more specifically below as the "Lally Loan" and the "Loftin Line of Credit"). Thus, the UST argues that a denial of the Debtor's discharge under 11 U.S.C. § 727 is warranted. For the following reasons, the UST's Motion for Summary Judgment will be granted, in part, and denied, in part.

### JURISDICTION AND VENUE

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334, 157(a), and Local General Order 2012-7 of the United States District Court for the Northern District of Ohio. Venue is proper pursuant to 28 U.S.C. § 1409(a). Actions to deny a debtor's discharge are core proceedings under 28 U.S.C. § 157(b)(1), (b)(2)(A) and (J) and the Court has authority to enter a final judgment.

2

## SUMMARY JUDGMENT STANDARD

In bankruptcy cases, including adversary proceedings, a party may move for summary judgment at any time before 30 days before the initial date set for an evidentiary hearing on any issue for which summary judgment is sought, unless a different time is set by local rule or the court orders otherwise. Fed. R. Bankr. P. 7056 (otherwise incorporating Fed. R. Civ. P. 56); *see also* Fed. R. Bankr. P. 9014(c). When a party so moves, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986). A Plaintiff movant must establish all essential elements supporting its claim in this fashion; a defendant must establish that any one (or more) essential elements of Plaintiff's claim fails, or establish all elements of one or more of defendant's affirmative defenses, in order to obtain a defense judgment by summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Evidence presented in support of summary judgment is viewed in the light most favorable to the non-moving party, "drawing all reasonable inferences in its favor." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 587 (1986). However, if a moving party meets its burden to establish a lack of genuine dispute as to a material fact, the burden then shifts to the non-moving party to "come forward with evidence which would support a judgment in its favor." *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e). In responding in this way to a motion for summary judgment, the non-moving party may not rely on a "mere scintilla of evidence" in support of its opposition to the motion. There must be enough evidence presented in which a fact-finder could reasonably find for the non-moving party. *Zenith*, 475 U.S. at 586.

3

## PROCEDURAL BACKGROUND

On November 1, 2015, the Debtor commenced the bankruptcy case underlying this adversary proceeding by filing a voluntary Chapter 7 petition, complete with schedules and the required support documents. The UST appointed Marc P. Gertz ("Gertz") to serve as the trustee tasked with administering the Debtor's estate. On December 21, 2015, Gertz conducted the Debtor's first meeting of creditors, pursuant to 11 U.S.C. § 341, which was adjourned to and concluded on January 11, 2016 (the "341 Meeting"). On June 1, 2016, the UST, along with Gertz, conducted a 2004 examination of the Debtor pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "2004 Exam"). After the UST initiated this adversary proceeding by filing the Complaint on June 20, 2016, the UST questioned the Debtor further at a deposition held on February 2, 2017 (the "Deposition").

The Motion is supported by the transcripts of the 341 Meeting (Exs. A, B), 2004 Exam (Ex. C), and the Debtor's Deposition (Ex. D), each of which consists of the Debtor's sworn testimony. The Motion is further supported by affidavits of Michael Lewis ("Lewis"), the executive vice president and chief operating officer of Hometown Bank, f.k.a. Home Savings of Kent ("Hometown") (Ex. F); John Weaver, the UST's bankruptcy auditor ("Weaver") (Ex. G); and Richard A. Loftin ("Loftin") (Ex. I); as well as various documents authenticated by testimony given in the transcripts and/or affidavits. This evidence supports the Court's finding of material facts, none of which are subject to any genuine dispute.

## FACTUAL BACKGROUND

The following facts are derived from the transcripts, affidavits, and documents attached to the UST's Motion (Docket Nos. 22-1 through 22-12), the transcripts and documents attached to the Debtor's Response (Docket Nos. 28-1 through 28-4), and the Court's review of its own

docket in both this adversary proceeding and the Debtor's underlying bankruptcy case. While the Debtor only expressly stipulated to a portion of the UST's factual background (Response at 3 n. 1), the facts of this case are drawn primarily from sworn testimony and appear largely undisputed.

Between May 2008 and June 2013, the Debtor worked as a loan officer and vice president of Hometown. The Debtor's duties included issuing commercial loans on behalf of Hometown. Previously, the Debtor had been employed as a financial institutions examiner for the Ohio Department of Commerce and as a loan officer for the Portage Community Bank.

On February 23, 2010, the Debtor and his spouse, Jennifer J. McDonald, entered into a loan arrangement with Patrick J. Lally (the "Lally Loan" and "Lally"), an individual with a then-ongoing commercial relationship with Hometown. The Debtor and his spouse signed a promissory note as consideration for a loan of $165,000.00 Lally advanced to them, promising to repay Lally the $165,000.00, plus interest at ten percent per annum, over a term of approximately ten years. (Ex. E.) The promissory note contains the following clause: "In the event the interest rate on the Line of Credit which Patrick J. Lally has with [Hometown] shall be raised above 10% per annum, then the interest rate of this obligation shall be raised to the same rate."

As a Hometown loan officer, the Debtor had overseen commercial loans extended by Hometown to Lally and his businesses, including the line of credit referred to in the promissory note evidencing the Lally Loan. Lewis, the COO of Hometown, testified that the Debtor entered into the Lally Loan without Hometown's knowledge and the Lally Loan was contrary to Hometown's policies. (Lewis Affidavit at ¶ 8.) Ultimately, the Debtor defaulted on the Lally Loan after making between six and nine payments. (*Id.* at ¶ 9; 2004 Exam Transcript (Ex. C) at 38:6-16.) Lally later assigned the Lally Loan promissory note to Hometown as part of a

settlement, and the Debtor has never made any payments to Hometown as the assignee of the promissory note. Lewis Affidavit at ¶ 10.

The Debtor deposited the Proceeds derived from the Lally Loan, totaling $165,000.00, into his and his wife's joint checking account (the "Checking Account") at PNC Bank on February 25, 2010. Prior to that, the Checking Account had a balance of $385.34.

The UST audited the Debtor's finances, including a review of the bank statements relating to the Checking Account. (Weaver Affidavit (Ex. G) ¶¶ 4, 6-10.) This audit revealed that during the months of March and April 2010, immediately after the deposit of the Lally Loan Proceeds, the Debtor drew 15 personal checks in amounts of at least $1,500.00 each against the Checking Account. (Weaver Affidavit at ¶ 14.) During discovery, the Debtor produced copies of three of those checks, totaling $5,680.31. *Id*. at ¶ 16. However, the Debtor never produced copies of the twelve other checks that totaled $59,561.10. *Id*. at ¶ 15. Although the Debtor testified that he used the Lally Loan to pay off creditors and consolidate loans, (2004 Exam Transcript at 21:19-22:16), he did not identify the payees of those dozen checks. The Debtor also made two significant cash withdrawals from the Checking Account, one for $17,200.00 on March 8, 2010, and the second for $2,000.00 on March 12, 2010. *Id*. at ¶ 18. The Debtor did not provide any explanation for those withdrawals, how the funds were used, or to whom (if anyone other than the Debtor) the cash was delivered. In total, the Debtor did not explain or document the use that was made of the $76,761.10 withdrawn from Checking Account in these transactions.

During that same time period, the Debtor also engaged in a series of wire transfers between the Checking Account and his TD Ameritrade brokerage account (the "Brokerage Account"). The Debtor initially transferred $90,000 to the Brokerage Account on March 9, 2010. He withdrew by wire transfer back to the Checking Account $7,500 on March 15; $8,500

6

on March 17; $7,000 on March 23; $5,500 on April 1; and $8,500 on April 23. In May and June

2010, six additional wire transfers were made from the Brokerage Account to the Checking

Account, totaling $12,617.50. On July 1, 2010, the Debtor wire transferred another $16,000.00

from the Brokerage Account back to the Checking Account.   After accounting for all of the

transfers between the Checking Account and the Brokerage Account, the Debtor transferred a net

amount of $24,382.50 to the Brokerage Account from the Lally Loan Proceeds. The Brokerage

Account records show that the Debtor incurred net investment losses, between March 9 and July

1, 2010, in the amount of $23,938.43.   The balance left in the Brokerage Account on July 1,

2010, was only $600.94.   By January 2011, the Brokerage Account no longer contained any

funds, including any Proceeds of the Lally Loan.   (2004 Exam Transcript (Ex. C) at 26:4-7.)

As the Proceeds of the Lally Loan invested in the Debtor's Brokerage Account became

depleted in January 2011, the Debtor engaged in a transaction that was even more deceptive.

While acting as a loan officer for Hometown, the Debtor prepared self-dealing loan documents in

order to obtain proceeds of a $225,000.00 line of credit (the "Loftin Line of Credit") from

Hometown using the identity of a Hometown banking customer, Richard A. Loftin ("Loftin").

(Ex. F.) In what was described as a "money laundering scheme" by Lewis, the COO of

Hometown, the Debtor perpetrated a fraud on Hometown and its customer, Loftin.   (Michael

Lewis Affidavit ¶ 14 (Ex. F)).   The Debtor prepared loan documents for the Loftin Line of

Credit in which Loftin, without his knowledge or consent, executed a loan application and other

loan documents for a line of credit, including a promissory note to Hometown.   (Michael Lewis

Affidavit ¶¶ 14-15 (Ex. F); Richard A. Loftin Affidavit ¶ 4-7 (Ex. I)).

Although he pled the Fifth Amendment during his 2004 Exam, refusing to testify about

these events, the Debtor later confessed to the fraudulent nature of the Loftin Line of Credit, his

role in establishing it, and the fact that he controlled the proceeds therefrom to his benefit. In his February 2, 2017 Deposition, the Debtor testified that Loftin had become obligated on paper to repay the Loftin Line of Credit, that Loftin had not authorized the Loftin Line of Credit or the draws against it, that the Debtor had the loan documents drawn up and arranged for Loftin to sign "unbeknownst to him." The Debtor carried out this deception by including the Loftin Line of Credit documents with the loan documents for another, legitimate loan that Loftin was taking out from Hometown at the same time. The Debtor went to Loftin's house, presented all of the documents to Loftin, and encouraged him to sign on the dotted line with respect to all of the loan documents, concealing the fact that the documents being signed included documents evidencing the fraudulent Loftin Line of Credit, of which Loftin had no knowledge and had not consented. The Debtor admitted that he did not advise Loftin that he was signing a promissory note or any other documents supporting the fraudulent Line of Credit. (McDonald Deposition, February 2, 2017 (Ex. D), at 24 - 29.)

The Debtor's scheme to obtain the proceeds available from the Loftin Line of Credit involved further deception. The Debtor enlisted, or at the very least utilized, the assistance of another Hometown borrowing customer, James E. "Jim" Mehallis ("Mehallis"), who is the sole owner of Accurate Fab, LLC ("Accurate Fab"), a commercial loan customer of Hometown. The Debtor testified that Mehallis was also a personal friend of the Debtor. (McDonald Deposition (Ex. D) at 23:22 – 24:5.) In fact, the Debtor not only had a friendship with Mehallis, but also owed him money that he borrowed in order to place gambling bets that were unsuccessful. (McDonald Deposition (Ex. D) at 41:20 – 42:4.)

In order to repay Mehallis, and also to conceal an additional disbursement of proceeds from the Loftin Line of Credit to the Debtor, the Debtor arranged for a check drawn against the

8

Loftin Line of Credit from Hometown and made payable to Mehallis in the amount of $158,651 on or about January 26, 2011. (McDonald Deposition (Ex. D) at 38:10 – 15; Michael Lewis Affidavit (Ex. F) at ¶17; Exhibit K.) Two days later, on January 28, 2011, Mehallis wrote a check from his bank account to the Debtor in the amount of $128,000, which was deposited into the Debtor's Checking Account. (McDonald Deposition at (Ex. D) 38:16 – 39:3; Michael Lewis Affidavit (Ex. F) at ¶¶ 12, 17.)   The disparity of slightly more than $30,000 between the check paid to Mehallis from the one Mehallis paid over to the Debtor appears to cover a debt of approximately $30,000 the Debtor owed to Mehallis. Several months earlier, on November 24, 2010, Mehallis wrote a check to the Debtor in the amount of $20,000.   (Exhibit H.) Approximately a week later, on November 30, 2010, Mehallis issued an additional check of $8,000 payable to the Debtor. (*Id*.; Michael Lewis Affidavit (Ex. F) at ¶12.) Through this subterfuge, the Loftin Line of Credit was drawn down to pay off the Debtor's debt to Mehallis for gambling debts and to deliver $128,000 cash to the Debtor without any direct payment from Hometown and the Loftin Line of Credit to the Debtor's Checking Account.

In addition, uncontroverted evidence shows that additional payments from the Loftin Line of Credit were used to make five payments on account of the Debtor's Bank of America credit card in the aggregate total of $15,266.25. (Michael Lewis Affidavit (Ex. F) at ¶18; McDonald Deposition (Ex. D) at 70:4 – 74:1.) These draws against the Loftin Line of Credit were made at the Debtor's direction. In similar fashion, the Debtor arranged for payments from the Loftin Line of Credit to pay down his mortgage loan with Huntington Bank in the amount of $4,280; pay down his auto loan with Chase Auto Finance in the amount of $1,420; pay $25,635.75 to a collections law firm of Weltman, Weinberg & Reis, apparently on account of one of Weltman's clients asserting a claim against the Debtor; and $14,410 to Scott Hamilton, an

9

individual in Kent, Ohio who was known to the Debtor and to whom the Debtor owed a gambling debt. *Id.* These transactions total $61,012, all drawn from the Loftin Line of Credit to pay creditors of the Debtor.

Immediately following these transactions in late January 2011, the Debtor used a large portion of the funds derived from the Loftin Line of Credit to replenish his Brokerage Account. On or about February 2, 2011, the Debtor wired $100,000 from his Checking Account to his Brokerage Account. (Weaver Affidavit (Ex. G) ¶ 27; McDonald Deposition (Ex. D) at 39:5–40:12.) At his 2004 Exam, the Debtor had pled the Fifth Amendment when prompted to explain this transfer and to identify the source of the $100,000. Later, after an investigation by Hometown, as described by Michael Lewis in his Affidavit, and as conceded by the Debtor in his Deposition, these funds were shown to be derived from the Loftin Line of Credit.

By June 2011, only four months later, the Brokerage Account contained only $200.93. (McDonald 2004 Exam (Ex. C) at 27:5 – 14.) When asked to account for the remaining balance of $99,799.07, the Debtor testified that he did not have any recollection of where the funds had gone. (McDonald 2004 Exam (Ex. C) at 27:10 – 22.) Nor was the Debtor able to account for the $28,000 received from Mehallis in January 2011 that was not deposited into the brokerage account. (McDonald Deposition at 60:2 – 7.) The Debtor has never provided any specific explanation as to the whereabouts of these funds, which total approximately $128,000.

During discovery conducted in conjunction with a 2013 lawsuit between Hometown and Lally, Hometown first discovered the existence of the Lally Loan and the Debtor's central role in its issuance. (Michael Lewis Affidavit ¶6.) Later that year, in August 2013, Loftin informed Hometown that the Debtor had admitted to him that the Debtor had taken out the Line of Credit in Loftin's name. (*Id.* at ¶15.) Hometown's investigation determined that Loftin had never

10

received any of the proceeds from the Line of Credit withdrawals. (*Id.*)

In response to the UST's request for documents under Federal Rule of Bankruptcy 2004(c), the Debtor produced various statements from two bank accounts, TD Ameritrade account statements, cancelled checks, and his federal tax returns for 2012 through 2015. Though requested, the Debtor did not produce his 2010 and 2011 federal tax returns, bank account records for January of 2010 through March of 2010, or numerous cancelled checks. Over $250,000 of the Debtor's assets remain missing and unaccounted for. The UST focuses on approximately $175,000 of those losses in support of his Motion.

## LEGAL ANALYSIS

At issue in this adversary proceeding are the UST's two asserted grounds for denying the Debtor's discharge under 11 U.S.C. § 727. First, the UST asserts that the Debtor knowingly made false oaths in violation of Section 727(a)(4)(A) by offering only vague statements in response to deposition questions regarding his use of the Proceeds from the Lally Loan and Loftin Line of Credit. Second, the UST contends that the Debtor's explanation of the dissipation of the Proceeds were unsatisfactory and therefore warrants a denial of his discharge under Section 727(a)(5).

The discharge injunction is an integral component of a debtor's "fresh start." *Yoppolo v. Sayre* (*In re Sayre*), 321 B.R. 424, 426-27 (Bankr. N.D. Ohio 2004). Thus, a denial of a debtor's discharge under Section 727 is an extraordinary remedy. *Id.* However, a debtor's complete and honest disclosure is required under the Bankruptcy Code and "…[n]either the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." *U.S. Trustee v. Halishak* (*In re Halishak*), 337 B.R. 620, 630 (Bankr. N.D. Ohio 2005) (quoting *Boroff v. Tully* (*In re Tully*), 818 F.2d 106, 110 (1st Cir. 1987) (quotations

11

and citations omitted)).

Asserting claims under Section 727, the UST has the burden of proving the required elements by a preponderance of the evidence. *In re Adams*, 31 F.3d 389, 394 (6th Cir. 1994); *Kovacs v. McVay* (*In re McVay*), 363 B.R. 824, 831 (Bankr. N.D Ohio 2006); *McDermott v. Davis* (*In re Davis*), 538 B.R. 368, 384 (Bankr. S.D. Ohio 2015).

**I.  Genuine Issues of Material Fact Remain with Respect to the Debtor's Alleged Fraudulent Intent and, Therefore, the UST Is Not Entitled to Summary Judgment on Count I Under 11 U.S.C. § 727(a)(4)(A).**

It is not clear to the Court whether the UST seeks summary judgment on Count I of his Complaint in his Motion. Although he does spend a page of his Motion outlining the standard for denial of discharge based on a false oath pursuant to 11 U.S.C. § 727(a)(4)(A) (Motion at 14-15), he then states that "the primary focus of this Motion will be on the second count of the Complaint: the Defendant's failure to explain satisfactorily his dissipation of those funds." (Motion at 15.) Having made little case for summary judgment on his Count I, as well as the fact that matters of intent typically require a trial, the Court concludes that the UST is not entitled to summary judgment on his Count I.

11 U.S.C. § 727(a)(4)(A) provides that a debtor's discharge will be denied if "the debtor knowingly and fraudulently, in or in connection with the case…made a false oath or account." *See Carter-Jones Lumber Co. v. Beatty* (*In re Beatty*), 583 B.R. 128, 138 (Bankr. N.D. Ohio 2018). Accordingly, to prevail on a Section 727(a)(4)(A) claim, "a plaintiff must prove by a preponderance of the evidence that: 1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case." *Keeney v. Smith* (*In re Keeney*), 227 F.3d 679, 685 (6th Cir. 2000). The Sixth Circuit panel in *Keeney*

explained fraudulent intent as "involve[ing] a material representation that [the speaker] know[s] to be false, or, what amounts to the same thing, an omission that [the speaker] know[s] will create an erroneous impression. A reckless disregard as to whether a representation is true will also satisfy the intent requirement." *Id.* at 685-86 (internal citations and quotations omitted).

A debtor's disclosures in the petition, schedules, and at the 341 Meeting are given under oath. *United States Trustee v. Zhang* (*In re Zhang*), 463 B.R. 66, 86 (Bankr. S.D. Ohio 2012) (citing *Hamo v. Wilson* (*In re Hamo*), 233 B.R. 718, 725 (B.A.P. 6th Cir. 1999)). A debtor's statements made at Federal Rule of Bankruptcy Procedure 2004 exams and at formal depositions are given under oath as well. *Id.* Accordingly, "any false statement made by the debtor in the debtor's schedules, at a creditors' meeting held pursuant to § 341 or during a deposition relating to the debtor's assets and financial circumstances could potentially lead to denial of a debtor's discharge under § 727(a)(4)(A) if all the required elements to establish that exception are proven." *Zhang*, 463 B.R. at 86; *see also Beatty*, 583 B.R. at 139.

Where a debtor's subjective intent is at issue, summary judgment is generally inappropriate unless all reasonable inferences defeat the claims of the opposing party. *Sicherman v. Rivera* (*In re Rivera*), 338 B.R. 318, 327 (Bankr. N.D. Ohio 2006) (citing *Hoover v. Radabaugh*, 307 F.3d 460, 467 (6th Cir. 2002) ("When the defendants' intent is at issue, summary judgment is particularly inappropriate.")). In other words, "…when facts…are capable of supporting conflicting yet plausible inferences…then the choice between those inferences is not for the court on summary judgment." *Desmond v. Varasso* (*In re Varasso*), 37 F.3d 760, 764 (1st Cir. 1994).

Because proof of the Debtor's intent is a required element under Section 727(a)(4)(A), summary judgment on that claim is not appropriate here. While the Debtor's existing statements

13

regarding what occurred to the Proceeds from the Lally Loan and Loftin Line of Credit are inconsistent and vague, there remains room for plausible inferences of honest intent on his part.

For example, the UST argues that the Debtor's vague statements regarding what occurred to the Loan Proceeds amount to a "reckless indifference" to the truth sufficient for a finding of fraudulent intent under Section 727(a)(4)(A). However, the Debtor responds that his inability to recall what occurred to the proceeds from the Lally Loan and Loftin Line of Credit is due in part to his gambling addiction and that addiction's impact on his ability to maintain his financial bearings.[1] Even if the Court were inclined to disbelieve the Debtor's explanation, credibility determinations of that sort must be resolved at trial. Thus, the factual issue of the Debtor's intent remains sufficiently disputed so as to render summary judgment inappropriate on the Trustee's Section 727(a)(4)(A) claim.

Although it dealt with a case brought under 11 U.S.C. § 523(a)(2)(A), *PNC Bank, N.A. v. Laskey* (*In re Laskey*), 441 B.R. 853 (Bankr. N.D. Ohio 2010) provides a helpful guideline that further supports a denial of summary judgment on the UST's Section 727(a)(4)(A) claim. In denying cross-motions for summary judgment that turned on factual issues of intent, the *Laskey* court noted that "issues involving an individual's state of mind" usually require a trial because "[d]eterminations concerning a debtor's state of mind require a subjective assessment of the debtor's intent which often can only be made by the trier-of-fact after it has had the opportunity to assess the credibility and the demeanor of witnesses who testify…." 441 B.R. at 856.

As in *Laskey*, summary judgment is not warranted here because the Debtor's state of

---

1 Despite stating that he did not have a gambling compulsion at the Deposition, the Debtor argues in his Memorandum of Opposition that much of his inability to recall what occurred to the Proceeds relates to his "gambling habit." The Court need not decide which to credit for purposes of this opinion.

mind when he offered vague explanations under oath regarding his use of the Proceeds of the

Lally Loan and Loftin Line of Credit remains a genuine issue regarding a material fact.

Accordingly, the Court finds that disputed issues of material fact regarding the Debtor's intent

warrant a denial of the UST's Motion as to his Section 727(a)(4)(A) claim.[2]

**II.      The UST Has Established That There Are No Genuine Issues of Material Fact Relevant to His Claim That The Debtor Failed to Explain Satisfactorily the Dissipation of the Proceeds from the Lally Loan and Loftin Line of Credit and That He Is Entitled to Summary Judgment on Count II of the Complaint Seeking Denial of the Debtor's Discharge Under 11 U.S.C. § 727(a)(5).**

Under Section 727(a)(5), a debtor's discharge will be denied where "the debtor has failed

to explain satisfactorily…any loss of assets or deficiency of assets to meet the debtor's

liabilities." 11 U.S.C. § 727(a)(5). Unlike other grounds to deny a debtor's discharge, such as

false oaths under Section 727(a)(4)(A) as the UST asserts in Count I, "a plaintiff need not

demonstrate wrongful intent on the part of the debtor in order to prevail on a § 727(a)(5) claim."

*Beatty*, 583 B.R. at 140 (citing *Smith v. Morse* (*In re Morse*), 550 B.R. 338, 361-62 (Bankr. E.D.

Tenn. 2016)); *Baker v. Reed (In re Reed)*, 310 B.R. 363, 368 (Bankr. N.D. Ohio 2004).   Instead,

Section 727(a)(5) "simply imposes strict liability" where the plaintiff meets his burden and the

debtor does not provide an adequate explanation. *Reed*, 310 B.R. at 368; *Hendon v. Lufkin* (*In re

Lufkin*), 393 B.R. 585, 601-03 (Bankr. E.D. Tenn. 2008), *aff'd*, 2010 WL 1332114 (E.D. Tenn.

March 29, 2010). Because of this peculiar aspect of Section 727(a)(5)'s grounds for denying a

debtor's discharge, the plaintiff's burden of going forward is limited to establishing "that there

exists the loss or the deficiency of a prepetition asset that could have been used to pay creditors."

---

[2] Because the Court finds that the UST's Section 727(a)(4)(A) action fails due to disputed issues of the Debtor's intent, the court will not address the other required elements.

*Reed*, 310 B.R at 369. Once the plaintiff meets his burden of going forward, "the burden then shifts to the debtor to come forward with evidence that will satisfactorily explain the loss of the asset." *Id.* (*citing Manhattan Leasing Systems, Inc. v. Goblick (In re Goblick),* 93 B.R. 771, 775 (Bankr. M.D. Fla. 1988)). Ultimately, "the burden of providing an explanation for the loss [is placed] on the person best suited to know the circumstances surrounding the transfer—the debtor." *Id.*

A.     **The UST Has Met His Burden of Identifying Prepetition Assets of the Debtor That Were Dissipated Prior to the Petition Date.**

In order to meet his burden of going forward on a Section 727(a)(5) claim that a prepetition asset that could have been used to pay creditors has been lost or is unaccounted for, a plaintiff must satisfy two conditions: (1) that "the debtor had a cognizable ownership interest in a specific fund(s) or identifiable piece of property; and (2) that [the debtor's] interest existed at a time not too far removed from when the petition was filed."[3]  *Reed*, 310 B.R. at 369.   In other words, the plaintiff "has the [initial] burden to identify assets which the debtor at one time owned and claims, in his schedules, to no longer possess." *Crocker v. Stiff* (*In re Stiff*), 512 B.R. 893, 900 (Bankr. E.D. Ky. 2018). The plaintiff must also show that the missing assets materially affected his bankruptcy creditors because they "existed at a time not too far removed from" the petition date.   *Reed*, 310 B.R. at 369.

---

3 Courts have offered different formulations of the Section 727(a)(5) test, with some describing it as consisting of two elements and others as only one. *Compare Reed*, 310 B.R. at 369 (describing two element test under Section 727(a)(5)) *with In re Stiff*, 512 B.R. 893, 900 (Bankr. E.D. Ky. 2018) (describing single element test under Section 727(a)(5)). While the Court finds the difference between the two formulations to be one of form rather than substance, the Court will utilize the two element formulation described by Judge Speer in *Reed* because that precedent arose in this District and also because it more squarely presents the issue of whether the Proceeds of the Lally Loan and Loftin Line of Credit are too far removed in time from the Debtor's bankruptcy case to be of material consequence for purposes of Section 727(a)(5).

1.    The Debtor Had a Cognizable Ownership Interest in Specific Assets That Were Lost or Dissipated.

The Court finds that the evidence presented by the UST in support of his Motion demonstrates beyond dispute that the Debtor maintained a cognizable ownership interest in the $390,000 cash Proceeds of the Lally Loan and Loftin Line of Credit. The Proceeds of the Lally Loan constituted cash owned by the Debtor as a result of taking out a loan from Lally, regardless of the Debtor's possible ethic violations in negotiating a loan with his employer bank's customer. Obtaining cash with a loan does not detract from the fact that those cash proceeds become assets of the borrower, albeit offset by liability created by the loan. The legal opinions considering Section 727(a)(5)'s exception to discharge involve a wide variety of "cognizable ownership interests," ranging from tangible luxury goods, such as jewels and crystal, *In re D'Agnese*, 86 F.3d 732, 733 (7th Cir. 1996); to cash proceeds of real estate sales, *Reed*, 310 B.R. at 369; to equity interests in business ventures, *Cohen, et al. v. Olbur (In re Olbur)*, 314 B.R. 732, 741 (Bankr. N.D. Ill. 2004); to loan proceeds, *Strzesynski v. Devaul (In re Devaul)*, 318 B.R. 824, 840 (Bankr. N.D. Ill. 2004), *First Commercial Finance Group, Inc. v. Hermanson (In re Hermanson)*, 273 B.R. 538, 546 (Bankr. N.D. Ill. 2002).   The Lally Loan Proceeds, as loan proceeds, qualify as a "cognizable ownership interest" as measured against this spectrum.

The Proceeds of the Loftin Line of Credit are more troublesome examples of assets owned by the Debtor. However, while the illicit manner in which those assets were acquired might have resulted in a judicially-imposed constructive trust or other equitable remedy in favor of Loftin or Hometown, the record here does not show that any remedy of that nature was ever impressed upon the Loftin Line of Credit Proceeds, including that portion which became cash in the Debtor's Checking Account and investments in his Brokerage Account. Those Proceeds

17

became the Debtor's assets, at least nominally, and were capable of being used to pay the Debtor's creditors. Indeed, tens of thousands of dollars of the Proceeds were in fact used for that purpose. The record also makes clear that the Debtor exercised unilateral control over the Proceeds.

Moreover, the Debtor admitted to ownership of the Proceeds in sworn testimony. The record includes numerous authenticated documents that confirm the Debtor had an ownership interest in, and control of, the Proceeds. Thus, the Court finds that the UST has carried his burden to produce evidence that the Debtor had a cognizable ownership interest in a specific fund or identifiable piece of property for the purpose of 11 U.S.C. § 727(a)(5).

2.  The Debtor's Interest In the Dissipated Proceeds of the Lally Loan and the Loftin Line of Credit Was Not Too Far Removed from the Debtor's Petition Date.

In contrast to many other provisions of the Bankruptcy Code relating to denial of a debtor's discharge, Section 727(a)(5) contains no express time limitation to the look-back period during which the loss or deficiency of an asset once held by the debtor warrants a satisfactory explanation. *Reed*, 310 B.R. at 369-70. Nevertheless, while not clearly defined, there is some limitation to the temporal proximity element of Section 727(a)(5). A Debtor's interest in the asset may not "exist at a time too far removed from when the petition was filed." *Id*. Section 727(a)(5) invites the Court to use its reasoned judgment to determine whether the asset in question in any given case was owned by the debtor at a time too remote from the debtor's petition date. "How long is too long ago depends on the case; there is no hard and fast rule." *Olbur*, 314 B.R. at 741 (citing *Hermanson*, 273 B.R. at 552).

It is helpful to review the decisions of other courts who have considered Section 727(a)(5)'s grounds for denying a debtor's discharge for guidance in evaluating whether the

Debtor in this case was obligated to explain satisfactorily the loss of the Proceeds from the Lally Loan and the Loftin Line of Credit.

In *Reed*, Judge Speer of this District considered the loss or dissipation of over $54,000 in cash proceeds from the debtor's sale of real estate 18 months before the debtor's bankruptcy filing. *Reed*, 310 B.R. at 370. Concluding that the asset was not too remote for Section 727(a)(5)'s scrutiny, Judge Speer observed that the missing money constituted a large sum. Moreover, he observed that the funds "were not immediately dissipated, but were rather spent on a continual basis." *Id*. *Reed* held that the loss "should be viewed as a continuum leading up to the filing of the Debtor's bankruptcy." *Id*.

The loss of equity in a business entity owned by a debtor and worth approximately $1.4 million, including holding $700,000 cash, seven years before debtor's petition date, and sold three years before the filing for a mere $30,000, was found to be not too remote for purpose of Section 727(a)(5) in *Blackwell Oil Co. v. Potts (In re Potts)*, 501 B.R. 711 (Bankr. D. Colo. 2013).

Proceeds totaling $45,000 of a family loan made to debtor three years before his petition date was not too remote. *Devaul*, 318 B.R. at 840.

A debtor's $4 million net worth six years before his filing, and $1.94 million in loan proceeds received five years before the filing, were found not to be too remote. *Hermanson*, 273 B.R. 538 (Bankr. N.D. Ill. 2002).

The Seventh Circuit upheld a bankruptcy court's denial of a discharge under Section 727(a)(5) where the unaccounted for assets were tangible luxury goods including jewelry, crystal, and silver worth approximately $300,000 was dissipated at least one year before, and as much as nine years before, the filing. *D'Agnese*, 86 F.3d at 732.

In *In re PNC Bank v. Buzzelli (In re Buzzelli)*, 246 B.R. 75 (Bankr. W.D. Pa. 2000), a bankruptcy court held that the unexplained dissipation of the debtor's interests in (i) certain real estate valued at $125,000 17 months before the filing, (ii) a collection of eleven Ferrari automobiles valued at $3.2 million four years earlier, (iii) an art collection valued at $100,000 four years earlier, and (iv) a wine collection valued at $90,000 eight years earlier all were found to be not too remote in time relative to the bankruptcy filing and were subject to Section 727(a)(5) scrutiny. *Buzzelli*, 246 B.R. at 118-21.

The only opinion cited by the parties in which the bankruptcy court held the asset to be too remote for purposes of Section 727(a)(5) analysis was *Olbur*, 314 B.R. at 741. *Olbur* held that the debtor's equity interest in businesses that ceased operation and became defunct six years and two years, respectively, before the debtor's bankruptcy filing were too remote and "failed to show a loss that [the debtor] had to explain." *Id*. The plaintiffs in *Olbur* "[did] not make it out of the starting blocks," having failed to meet their burden of production sufficiently to switch the burden to the debtor to explain the loss. *Id*.

Synthesizing these decisions, several key questions became apparent. Was the asset extraordinary in comparison to the debtor's financial affairs? Was the asset speculative in value and, therefore, of exaggerated materiality to the debtor's creditors? Was the asset cash that could be easily depleted over time, or was it a tangible asset of significant, perhaps appreciating value (such as art, jewelry, silver, or Ferrari automobiles), whose sale or transfer itself might be extraordinary? Was the asset sufficiently substantial to have made a difference to the creditors months or years later, or was it an illusory asset with a speculative value that, like a mirage, only appears valuable in hindsight to thirsty creditors? Would it be reasonable to expect the asset to have been exhausted in the ordinary course of the debtor's life and financial affairs during the

intervening period of time or was it a durable investment that might be expected to be available on a rainy day to meet creditors claims?  The answers to these questions sort out the materiality of the missing assets to the bankruptcy creditors.

In this case, the Debtor had, within 4½-5½ years of his bankruptcy filing, loan proceeds or embezzlement proceeds of $390,000, an amount that was certainly large.  It was a significantly larger sum than the unaccounted for assets in many of the cited Section 727(a)(5) cases.  As cash, these funds were not of speculative value, as were the debtor's equity interest in businesses that failed two and six years before bankruptcy filing in *Olbur*. The evidence shows that more than $250,000 of the Proceeds were either transferred in specific, but unexplained, transactions or otherwise dissipated without any documentation or explanation before the Debtor's case was filed. As *Reed* observed, many of these losses "should be viewed as a continuum leading up to the Debtor's bankruptcy." *Reed*, 310 B.R. at 370. In other words, because the Proceeds were cash and the fact that as much as $75,000 may have disappeared more recently than 4½ years before the Debtor's bankruptcy filing, the Court may reasonably presume that the dissipation of the cash may have continued up to the petition date itself.

Because the loss of assets here is more substantial, quantifiable, and material than those considered in *Olbur*, the Court finds that *Olbur* is of limited application here and does not compel a finding that the Debtor's Proceeds existed too remote in time for Section 727(a)(5) to apply.

The statutory text of Section 727(a)(5), lacking as it does a time limitation, suggests that its ambit is broad, flexible, and fact-specific. *See Reed*, 310 B.R. at 369-70; *see also Olbur*, 314 B.R. at 741. This flexibility gives the Court ample authority to apply the statute to the Debtor's discharge based on the facts of this case. Accordingly, the Court finds that the dissipation of

Proceeds totaling at least $176,560.17 is not "too far removed" for purposes of the UST's § 727(a)(5) claim.[4]

**B.     The Debtor Has Failed to Explain Satisfactorily the Dissipation of Assets.**

Once a plaintiff has made this initial showing, the burden shifts to the debtor, who must then offer a satisfactory explanation for the loss or dissipation of the assets in question. *McVay*, 363 B.R. at 831; *Stiff*, 512 B.R. at 900. A satisfactory explanation "is one that is reasonable under the circumstances." *McVay*, 363 B.R. at 831 (quoting *Lacy Wholesale & Main Factors v. Bell*, 156 B.R. 604, 605 (Bankr. E.D. Ark. 1993)). A debtor's explanation need not be comprehensive or free from error to be found satisfactory, "but must consist of more than a vague, indefinite, and uncorroborated hodgepodge of financial transactions and must be explained in good faith." *In re Ferrari*, 587 B.R. 504, 515 (Bankr. N.D. Ill. 2018) (quotation omitted).

A key focus of the "reasonable explanation" inquiry under Section 727(a)(5) is whether the debtor's proffered explanation is capable of being verified. *Id.* In other words, "…is the explanation sufficient to enable either the trustee or a creditor to properly investigate the circumstances surrounding the loss or deficiency?" *Id.* (quoting *Reed*, 310 B.R. at 369). Further, a debtor's financial sophistication and familiarity with the circumstances underlying the loss of assets are relevant to the issue of whether a debtor's explanation is satisfactory. *See Miller v. Bauer* (*In re Bauer*), 128 Fed.Appx. 467 (6th Cir. 2005) (unpublished) (affirming bankruptcy court's finding that debtor's explanation was unsatisfactory where the debtor had

---

4 The Debtor argues that the UST "fail[ed] to produce any evidence…on the issue of the assets' remoteness." (Docket No. 28, p. 8) However, the voluminous evidence presented in support of the Trustee's Motion is sufficient for the Court to conclude that the UST carried his burden to show that the dissipated assets were not too remote in time to be relevant to the denial of the Debtor's discharge in this case.

"…considerable business sophistication and familiarity with the dispute over the settlement funds…"); *Devaul*, 318 B.R. at 840 ("…the court may consider such things as the nature of [the] debtor's business, as well as his education and financial and business sophistication.") (citations omitted); *Beatty*, 583 B.R. at 141 (describing sliding scale analysis of what constitutes a satisfactory explanation under Section 727(a)(5) with reference to the debtor's level of sophistication).

The Debtor is well-educated and experienced in banking transactions. Notwithstanding this background, his own testimony reveals an unwillingness to come forward in good faith and explain satisfactorily what hundreds of thousands of dollars derived from the Lally Loan and Loftin Line of Credit were used for.

The Debtor does account for approximately $30,000 paid to Mehallis for gambling debts. He provided copies of three checks showing the specific use of $5,680.31 from the Lally Loan Proceeds. He produced Brokerage Account statements evidencing $23,938.43 in trading losses during 2010 from investments made with the Lally Loan Proceeds. He documented the use of $61,012 from the Loftin Line of Credit to pay another gambling debt, make five payments on a credit card, pay off a collection firm on account of the claim of an unspecified creditor, and pay down a home mortgage loan and car loan. However, this accounts for only $120,630.74, less than a third of the $390,000 Proceeds of the Lally Loan and the Loftin Line of Credit combined.[5]

The evidence offered in support of the Motion focuses on two components of the remaining unaccounted cash. First, with regards to the $76,761.10 in personal checks drawn

---

[5] The evidence shows draws against the Loftin Line of Credit totaling $219,663. It appears that the remaining $5,337 of availability on that credit line may never have been drawn down.

from, and cash withdrawals made from, the Checking Account, the Debtor provided no explanation and did not turn over copies of those checks. The Debtor was willing and able to produce copies of the smaller checks, but he would not and did not document or explain these larger transactions. As for the $99,799.07 that disappeared from the Debtor's Brokerage Account between February 2011 and June 2011, the Debtor stated at the 2004 Exam that he had no recollection of where those funds went. In his Response, the Debtor merely explained that their dissipation relates to day-trading losses. His failed investments of $90,000 of the Lally Loan Proceeds led to losses of $23,938.43, approximately 27 percent of the total investment, over the course in four months during 2010. The Debtor suggests to the UST and the Court, without documentation or specific recollection, that his $100,000 trading experience in a similar four-month period in 2011 resulted in virtually a 100 percent loss.[6]

These explanations are unsatisfactory under Section 727(a)(5). Not only are they vague, they require the Court and the UST to speculate as to what occurred with the Proceeds. Even if the Court were to credit the Debtor's explanation that the $99,799.07 in the Brokerage Account were dissipated as investment losses, there is no record evidence to verify whether that is actually true. Thus, because the Debtor's explanations are incomplete and unverifiable, they are not satisfactory. Accordingly, the Court finds that they are not satisfactory as required by Section 727(a)(5). *See Ferrari*, 587 B.R. at 515.

The Debtor argues that both the lengthy timeframe and his gambling/day-trading interests

_____

6 Even after accounting for documented uses of the Proceeds, as well as the unexplained transactions and Brokerage Account losses the UST focuses on in his Motion, and the possibility that about $5,000 was never drawn from the Loftin Line of Credit, it appears to the Court that an additional amount of approximately $90,000 has not been explained. Perhaps the UST focused on low-hanging fruit when he concentrated the focus of his Motion on the unexplained checks, cash withdrawals, and dissipated Brokerage Account. Narrowing the factual focus on certain lost assets does not diminish the impact of the Motion. For purposes of the Motion, the Court will disregard these other losses and consider them matters that might have been at issue at trial.

excuse his lack of specificity with regards to explaining the whereabouts of the $176,560.17 in Proceeds. However, the Debtor cannot be excused from his duty to explain satisfactorily the dissipation of significant assets because he chose to engage in activities that include expenditures in the form of gambling and day-trading losses that may be difficult to document. Section 727(a)(5) imposes a strict liability for this failure. Debtors such as this Debtor, with his relevant educational background and work experience, must provide a better, less evasive, accounting than was evidenced in the Debtor's sworn testimony.

The Debtor disputes the UST's attempt to hold his lack of documentation regarding the unaccounted-for Proceeds against him on the ground that counsel for the UST verbally excused him from producing those documents. However, the Court need not decide this discovery squabble. It is the Debtor's burden to explain the loss or dissipation of assets identified by a plaintiff, such as the UST here, seeking denial of discharge under Section 727(a)(5). The Debtor failed to meet his burden. The Debtor's unreasonably vague testimony regarding the whereabouts of the missing Proceeds is not satisfactory under Section 727(a)(5).

The denial of the Debtor's discharge in this case is about accounting, not morality judgment. Section 727(a)(5) only looks to the adequacy of the explanation and not the propriety of the circumstances underlying the dissipation of assets. *Reed*, 310 B.R. at 371. Thus, the legality of the debtor's activities that led to the dissipation of assets, and also in this case the acquisition of those assets, is irrelevant to a court's analysis of a debtor's explanation. *Id.* Nevertheless, "…so as not to reward bad behavior, the bar is not lowered for debtors who dispose of their assets in a less than proper manner." *Id.* (citing *Dolin v. Northern Petrochemical Co.*, 799 F.2d 251 (6th Cir. 1986)). Section 727(a)(5) concerns the cover-up, not the crime.

## CONCLUSION

The UST cannot prevail on his Section 727(a)(4)(A) claim on summary judgment because the facts presented leave room for doubt regarding the Debtor's intent when he attempted to explain what happened to the Proceeds. However, the UST has established grounds for summary judgment on Count II that the Debtor failed to explain satisfactorily the dissipation of substantial cash in violation of Section 727(a)(5). The Court finds that the unaccounted for cash Proceeds from the Lally Loan and the Loftin Line of Credit are significant and sufficiently related to the Debtor's estate. Further, the plain language of Section 727(a)(5) does not restrict consideration of the events here despite the fact that they occurred as much as five years before the Petition Date. The facts of this case support an expansive look-back period. Thus, the Court finds that the Debtor's failure to explain the dissipation of the cash satisfactorily merits a denial of the Debtor's discharge.

The Court need not pass judgment on the Debtor's activities underlying the genesis of the Lally Loan and Loftin Line of Credit in order to find his explanation regarding the dissipation of funds unsatisfactory. Regardless of the propriety of entering into self-dealing loan agreements or opening a line of credit under another person's name in pursuit of paying off gambling debts, it is the Debtor's unacceptably vague accounting for the missing cash provided to the panel trustee and the UST over the course of this case and adversary proceeding that is not legally satisfactory under Section 727(a)(5) and results in the denial of discharge.

In light of the foregoing, the Court will enter a separate order consistent with this Memorandum Decision granting the Trustee's Motion for Summary Judgment, in part, denying it in part, and denying the Debtor a discharge pursuant to 11 U.S.C. § 727(a)(5). The Court also finds that there is no just reason for delay in entering a final judgment denying the Debtor's

discharge at this time based on the UST's Count II alone.   *See* Fed. R. Civ. P. 54(b); Fed. R. Bankr. P. 7054(a).   The denial of the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(5) on the claim asserted by the UST in Count II provides the UST with the complete relief he seeks against the Debtor.

The Court's judgment granting Trustee's Motion for Summary Judgment on Count II of the UST's Complaint and denying the Debtor a discharge will not be deemed entered until the separate form of judgment consistent with this Memorandum Decision has been docketed by the Clerk.

# # #